**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CIVIL ACTION NO. 3:25-CV-00191-CRS-CHL**

**LATONYA C.,[1]** **Plaintiff,**

**v.**

**COMMISSIONER OF SOCIAL SECURITY,[2]** **Defendant.**

**REPORT AND RECOMMENDATION**

Before the Court is the Complaint filed by Plaintiff, Latonya C. ("Claimant"). Claimant seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"). (DN 1.) This case was referred to the undersigned Magistrate Judge to prepare a report and recommendation. (DN 10.) Claimant and the Commissioner each filed a Fact and Law Summary and/or supporting brief, and Claimant filed a reply. (DNs 11, 12, 14, 15.) Therefore, this matter is ripe for review.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **REVERSED** and that this matter be **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), to the Commissioner for reconsideration with instructions to conduct additional proceedings to remedy the herein identified defects in the original proceedings.

## I. BACKGROUND

On or about July 12, 2021, Claimant protectively filed an application for supplemental security income under Title XVI ("SSI"), and on or about August 12, 2021, Claimant filed an application for disability insurance benefits under Title II ("DIB"). (R. at 17, 69, 78-79, 88-89,

[1] Pursuant to General Order 23-02, the Plaintiff in this case is identified and referenced solely by first name and last initial.
[2] As Frank Bisignano is now the Commissioner of Social Security, he is automatically substituted as the Defendant in this matter pursuant to Fed. R. Civ. P. 25(d). The Clerk is directed to change the case caption to reflect the substitution.

99-101, 209-25.) Her applications alleged disability beginning on January 30, 2021, due to asthma, post-traumatic stress disorder, depression, broken left ankle, and allergies. (*Id*. at 17, 69, 78-79, 88-89, 99-101, 247.) Claimant's applications were denied initially and again on reconsideration. (*Id.* at 117-25, 132-39.)

At Claimant's request, Administrative Law Judge ("ALJ") Susan Brock ("the ALJ") conducted a hearing on Claimant's application on August 16, 2023. (*Id.* at 37-68, 140-42.) Claimant and her counsel appeared by telephone. (*Id*. at 39, 180.) An impartial vocational expert also participated in the hearing. (*Id*. at 40.) During the hearing, Claimant testified to the following. She lives alone and doesn't drive due to the medications she takes. (*Id.* at 42-43.) She had recently been in and out of the hospital due to her blood pressure and her migraines. (*Id.* at 43.) She gets daily migraines during which she experiences photosensitivity and high blood pressure. (*Id.* at 51-52.) She takes medication to assist with her migraines and once she takes it, she feels better in about thirty-five minutes. (*Id.* at 52.) Her blood pressure has been so high lately it has made "standing and all that" impossible at times. (*Id.* at 51.) She has numbness in her legs when sitting that turns into shooting pains down the right side of her body; she also experiences inflammation and swelling on her left side. (*Id.* at 51-52.) The swelling in her legs happens "all the time," and she both elevates and soaks her legs in Epsom salts to assist with the swelling. (*Id.* at 53.) She has trouble walking and feels unsteady. (*Id.* at 54.) She sometimes uses a walker or cane to lean on. (*Id.* at 57-58.) Her medications make her tired and "take[] everything out of [her]." (*Id.* at 56.) They also keep her from comprehending and focusing. (*Id.* at 58.) She has depression and anxiety around other people and "close[s] [her]self down." (*Id.* at 55.) She attends group counseling and therapy weekly. (*Id.*at 59.) She has times where she doesn't want to talk or be around anyone, testifying, "[S]ometimes the world is just too much; it's just too much to deal

with." (*Id.* at 60.) She sleeps poorly at night due to both her physical and mental health, getting two to three hours of sleep per night. (*Id.* at 58-59.)

The ALJ issued an unfavorable decision on January 24, 2024. (*Id.* at 14-36.) Applying the five-step sequential evaluation process promulgated by the Commissioner to determine whether an individual is disabled, the ALJ made the following findings. First, Claimant had not engaged in substantial gainful activity since January 30, 2021, the alleged onset date. (*Id.* at. 20.) Second, Claimant's status post left ankle fracture, lumbar spondylosis, migraines, depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder were severe impairments. (*Id.* at 21.) Third, Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment from 20 C.F.R. Pt. 404, Subpt. P, App. 1. (*Id.* at 22.) Fourth, Claimant had the residual functional capacity ("RFC") to perform sedentary with the following exceptions:

> the claimant can occasionally climb ramps and stairs but can never climb ladders, ropes, or scaffolds. The claimant can occasionally balance, stoop, kneel, crouch, and crawl. The claimant can have occasional exposure to vibration but must avoid all exposure to unprotected heights. The claimant can understand, remember, and carry out simple and some detailed instructions. The claimant can sustain concentration in two-hour segments for repetitive tasks. The claimant can tolerate occasional interaction with coworkers, supervisors, and the general public. The claimant can tolerate occasional workplace changes gradually introduced.

(*Id.* at 24.) The ALJ also found at step four that based on this RFC, Claimant could perform her past relevant work as a wire worker as that job is actually performed because the same did not require the performance of work-related activities precluded by the Claimant's RFC. In the alternative, the ALJ found at step five that there were other jobs available in significant numbers in the national economy that Claimant could perform. (*Id.* at 30.) The ALJ concluded Claimant had not been under a disability, as defined in the Social Security Act, from January 30, 2021, through the date of her decision. (*Id.* at 31.)

Claimant subsequently requested an appeal to the Appeals Council, which denied her request for review on February 6, 2025. (*Id.* at 1-6, 206-08.) At that point, the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 422.210(a) (2025); *see also* 42 U.S.C. § 405(h) (discussing finality of the Commissioner's decision). Pursuant to 20 C.F.R. § 422.210(c), Claimant is presumed to have received that decision five days later. 20 C.F.R. § 422.210(c). Accordingly, Claimant timely filed this action on April 6, 2025. (DN 1.)

## II. CONCLUSIONS OF LAW

The Social Security Act authorizes payments of DIB and SSI to persons with disabilities. *See* 42 U.S.C. §§ 401-434, 1381-1383f. An individual shall be considered "disabled" if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a) (2025).

### A. Standard of Review

The Court may review the final decision of the Commissioner but that review is limited to whether the Commissioner's findings are supported by "substantial evidence" and whether the Commissioner applied the correct legal standards. 42 U.S.C. § 405(g); *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). "Substantial evidence" means "more than a mere scintilla"; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Court must "affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would also have supported the opposite conclusion." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2013); *see Smith v. Sec'y of Health & Hum. Servs.*, 893 F.2d 106, 108 (6th Cir. 1989) (holding that

if the court determines the ALJ's decision is supported by substantial evidence, the court "may not even inquire whether the record could support a decision the other way"). However, "failure to follow agency rules and regulations" constitutes lack of substantial evidence, even where the Commissioner's findings can otherwise be justified by evidence in the record. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

**B. Five-Step Sequential Evaluation Process for Evaluating Disability**

The Commissioner has promulgated regulations that set forth a five-step sequential evaluation process that an ALJ must follow in evaluating whether an individual is disabled. 20 C.F.R. §§ 404.1520, 416.920 (2025). In summary, the evaluation process proceeds as follows:

(1) Is the claimant involved in substantial gainful activity? If the answer is "yes," the claimant is not disabled. If the answer is "no," proceed to the next step.

(2) Does the claimant have a medically determinable impairment or combination of impairments that satisfies the duration requirement[3] and significantly limits his or her physical or mental ability to do basic work activities? If the answer is "no," the claimant is not disabled. If the answer is "yes," proceed to the next step.

(3) Does the claimant have an impairment that meets or medically equals the criteria of a listed impairment within 20 C.F.R. Part 404, Subpart P, Appendix 1? If the answer is "yes," the claimant is disabled. If the answer is "no," proceed to the next step.

(4) Does the claimant have the RFC to return to his or her past relevant work? If the answer is "yes," then the claimant is not disabled. If the answer is "no," proceed to the next step.

(5) Does the claimant's RFC, age, education, and work experience allow him or her to make an adjustment to other work? If the answer is "yes," the claimant is not disabled. If the answer is "no," the claimant is disabled.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[3] To be considered, an impairment must be expected to result in death or have lasted/be expected to last for a continuous period of at least twelve months. 20 C.F.R. §§ 404.1509, 416.909 (2025).

The claimant bears the burden of proof with respect to steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). However, the burden shifts to the Commissioner at step five to prove that other work is available that the claimant is capable of performing. *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008). The claimant always retains the burden of proving lack of RFC. *Id.*; *Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 392 (6th Cir. 1999).

**C. Claimant's Contentions**

Claimant made two arguments. (DNs 11, 12, 15.) First, Claimant argued that the ALJ did not properly address Claimant's pulmonary impairments at either step two in determining whether she had any severe impairments or in the ALJ's RFC analysis at step four. (DN 11, at PageID # 1081-87; DN 12; DN 15, at PageID # 1116-21.) Second, Claimant argued that the ALJ erred in her evaluation of the opinion evidence of record. (DN 11, at PageID # 1087-92; DN 12, at PageID # 1095; DN 15, at PageID # 1121-25.) Because the undersigned finds remand is appropriate as to the first argument, he does not reach the second.

Claimant argued that the ALJ failed to properly address her pulmonary impairments at steps two and four of the sequential evaluation process. (DN 11, at PageID # 1081-87; DN 12; DN 15, at PageID # 1116-21.) Claimant argued that the ALJ never truly made a severity finding at step two as to Claimant's pulmonary impairments as well as that her analysis did not "create a logical bridge to pulmonary nonseverity." (DN 11, at PageID # 1082; DN 15, at PageID # 1116, 1119.) Claimant argued that the ALJ compounded this error by doing an insufficient analysis at step four in determining her RFC, playing doctor as to certain testing results in the record and improperly rejecting the opinion testimony of record. (DN 11, at PageID # 1085-86; DN 15, at PageID # 1117-18.)

At step two, the ALJ found Claimant to have severe impairments including status post left ankle fracture, lumbar spondylosis, migraines, depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder. (R. at 21.) The ALJ listed those impairments in her third numerical finding set out in bold in her opinion; then, immediately thereunder, she wrote, "The above medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28." (*Id.*) Below that conclusion, the ALJ discussed Claimant's "history of respiratory problems including a previous COVID infection, sinusitis, allergies, and chronic obstructive pulmonary disease." (*Id.*) Claimant is correct that nowhere in the step two analysis that followed did the ALJ explicitly state that she found those impairments to be non-severe. (*Id.* at 21-22.) However, at the conclusion of her step two findings, she stated that she "considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the [C]laimant's [RFC]." (*Id.* at 22.) Then, in her RFC analysis, the ALJ stated, "a finding that the [C]laimant's pulmonary condition is nonsevere is more consistent with the evidence now available." (*Id.* at 28.) Thus, the ALJ's opinion made clear that she considered Claimant's pulmonary conditions to be nonsevere impairments. Claimant cited no authority supporting that the ALJ's failure to explicitly state in her step two findings that she considered Claimant's pulmonary/respiratory impairments to be nonsevere was reversible error, and the undersigned is aware of none given that the conclusion is expressly made at step four and implicit in the ALJ's actual step two analysis.

Claimant next argued that it was error for the ALJ to determine that her pulmonary/respiratory impairments were not severe; she repeated several times in her analysis that step two is a "*de minimus* screening standard." (DN 11, at PageID # 1083; DN 15, at PageID # 1117.) While the Sixth Circuit has used that language regarding step two, *Higgs v. Bowen*, 880

F.2d 860 (6th Cir. 1988), the Sixth Circuit has held also that an ALJ's failure at step two to find a particular impairment to be severe does not constitute reversible error so long as the ALJ found that the claimant had other severe impairments and moved on to the other steps prescribed by the regulations. *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). *See also Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009). This is because the determination that an impairment is non-severe does not prevent an ALJ from considering it in his or her assessment of a claimant's RFC; instead, an ALJ is required to consider both severe and non-severe impairments in assessing a claimant's RFC. *See* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2) (2025). Thus, "[t]he fact that some of [a claimant]'s impairments were not deemed to be severe at step two is therefore legally irrelevant." *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008); *see also Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 852 (6th Cir. 2020) (citing *Maziarz*, 837 F.2d at 244). As such, the undersigned finds that the ALJ's failure to categorize Claimant's respiratory and pulmonary impairments as a severe impairments at step two does not alone constitute reversible error. Nonetheless, in Claimant's case, this conclusion does not end the analysis because the undersigned finds that the combination of the ALJ's step two and step four analysis regarding Claimant's pulmonary impairments is deficient and unsupported by substantial evidence.

At step two, the ALJ acknowledged that Claimant had "a history of respiratory problems including a previous COVID infection, sinusitis, allergies, and chronic obstructive pulmonary disease" and that she has been prescribed oral and inhaled medications for those conditions. (R. at 21 (citing 493-536, 569-631, 903).) However, the ALJ then reasoned,

> These treatments seem effective as the claimant performed fairly well on her Pulmonary Function Study. The claimant had a forced vital capacity (FVC) of eighty-five percent of its predicted value a one second forced expiratory volume (FEV-1) value that was sixty-five percent of its expected value before

> administration of a bronchodilator. A diagnosis of chronic obstructive pulmonary disease is generally indicated where this value falls below seventy-five percent. Following the administration of a bronchodilator the claimant's FVC was ninety-two percent of its expected value, and the FEV-1 was seventy-five percent of its expected value. The numbers while not dilated are indicative of moderate chronic obstructive pulmonary disease while the dilated numbers would correlate to a mild or non-finding of chronic obstructive pulmonary disease.

(*Id.* (citing *id.* at 468-70).) The ALJ then observed that Claimant's oxygen saturation was extremely poor as of the date of her function study as compared to other findings in the record:

> The other thing which should be pointed out is that it appears on the date of the pulmonary function study the claimant was suffering from unusually poor lung function relative to her regular lung function. The claimant's oxygen saturation at the time of the test was 86% which is unusually low. The longitudinal record both prior to this test and following shows the claimant generally has an oxygen saturation in the normal range above 95%. This was even true when the claimant was reporting to the emergency room with shortness of breath while experiencing COVID infection.

(*Id.*) The ALJ concluded, "there is reason to believe that the claimant's pulmonary issues are even more mild than indicated by the pulmonary function study." (*Id.*) Then, in her RFC analysis, the ALJ made only limited references to Claimant's pulmonary impairments in her rejection of the opinion evidence of record. The ALJ found only partially persuasive the findings of the state agency medical consultants, who she noted had "assigned limitations based upon the claimant's chronic obstructive pulmonary disease" and had "not consider[ed] the conflicting evidence showing constant good oxygen saturation levels, limited findings on the pulmonary function test that are likely an outlier for the reasons discussed previously and did not have access to the claimant's testimony which did contain significant complaints of shortness of breath."[4] (*Id.* at 28 (citing *id.* at 69-77, 79-87, 89-98, 101-110).) The ALJ also found unpersuasive the opinion of the consultative examiner who had, in the ALJ's words, "opined that the claimant was basically

[4] The undersigned presumes the ALJ made a typographical error and meant to say the Claimant's testimony did "not" contain significant complaints of shortness of breath as Claimant neither mentioned shortness of breath during the hearing nor did either the ALJ or Claimant's attorney inquire about the same. (R. at 37-68.)

nonfunctional due to dyspnea." (*Id.* (citing *id.* at 463).) She found the examiner's opinion unpersuasive because his physical examination findings other than Claimant's healing ankle injury were "essentially normal." (*Id.*) Then the ALJ again invoked her earlier reasoning regarding Claimant's pulmonary function testing, writing, "This is also inconsistent with the non-severe findings on the claimant's pulmonary function test and the ongoing regular oxygen saturation levels. This is also inconsistent with the record showing that the claimant maintained two periods of employment following this examination." (*Id.* (citing *id.* at 37-68, 239-40, 323, 331, 468-70, 754, 773, 854, 904, 938, 960, 992).)

The undersigned finds the ALJ's analysis of Claimant's February 16, 2022, pulmonary function study particularly troubling. While the ALJ correctly recounted the percentages reflected on the examiner's report, the other information the ALJ injected into her analysis regarding when a diagnosis of chronic obstructive pulmonary disease is indicated and whether the numbers reflected moderate, mild, or no finding of the disease is not reflected either in the examiner's report or anywhere else in the record. Instead, whereas the ALJ stated that the percentages reflected in the report were reflective of moderate chronic obstructive pulmonary disease before the bronchodilator and mild to no-finding afterward, the report itself actually stated:

| | | |
|---|---|---|
| System Interpretation | Pre | Moderate Obstruction |
| | Post | Moderate Obstruction |

(*Id.* at 469.) The undersigned agrees with Claimant that the ALJ's analysis of the pulmonary function study appears to be an instance of the ALJ inappropriately "playing doctor," injecting her own medical opinion into the record. *See Simpson v. Comm'r of Soc. Sec.,* 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings"); *see*

*also Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006) ("[T]he ALJ may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence."). While it is permissible for an ALJ to rely on medical data that has already been interpreted and read by technicians or other medical professionals, the instant case is distinguishable from those where an ALJ relied on a radiologist's report about an x-ray or MRI. *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 727 (6th Cir. 2013) ("Furthermore, the ALJ did not interpret raw medical data beyond her ability. The x-rays of Rudd's hands and lumbar spine, which were the only raw medical data, had already been read and interpreted by a radiologist."). Instead, the ALJ appeared to be opining as to whether Claimant's test results are consistent with a diagnosis of chronic obstructive pulmonary disorder; the undersigned finds the same wholly inappropriate and distinguishable from other cases where the ALJ can be said to be merely weighing the evidence within her purview. *See Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008) ("In making the residual functional capacity finding, the ALJ may not interpret raw medical data in functional terms."). None of the opinion evidence in the record supports the ALJ's interpretation of the pulmonary function testing either. The state agency medical consultants, who had an opportunity to review the February 16, 2022, testing, all still found Claimant's chronic obstructive pulmonary disease to be a severe impairment and assessed related limitations, including that Claimant should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. (R. at 70-71, 74-75, 70-81, 84-85, 90-91, 95, 102-03, 107.) The ALJ did not assess any such limitations. And while the Commissioner urges the Court to find harmless error because he claims that the jobs identified by the VE would not have been impacted even had the ALJ incorporated such a limitation (DN 14, at PageID # 1111-12), to do the same, the undersigned would have to speculate that nothing else about the ALJ's RFC determination

would have changed had she properly evaluated the Claimant's pulmonary function testing. The undersigned finds it would be inappropriate to do so. Courts have held repeatedly that a reviewing court's role in determining whether an ALJ's decision is based upon substantial evidence is not to "resolve conflicts in evidence or decide questions of credibility." *Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 253 (6th Cir. 2016) (citing *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012)). To take the Commissioner's position, the undersigned would have to do just that.

The undersigned cannot say that the remainder of the ALJ's analysis setting aside the pulmonary function study constitutes substantial evidence to support her determination. The ALJ's opinion about the pulmonary function study pervades her entire analysis as she repeatedly refers to the testing results in combination with Claimant's oxygen saturation levels to indicate improvement in Claimant's condition reasoning that if Claimant's pulmonary function was at the level reported on a date when she had low oxygen saturation, her condition was likely mild the remainder of the time when the record reflected better saturation levels. But again, this relies on the ALJ's flawed analysis of the pulmonary function study. As Claimant points out, her record did reflect prior exacerbations of her chronic obstructive pulmonary disease symptoms and signs of pulmonary abnormalities during the period at issue, including after the date of the function study. (R. at 463, 495, 497, 505-06, 515, 518, 522, 524, 573, 579, 902, 904, 912, 936-37, 1026.) Thus, the undersigned cannot say that the ALJ's analysis fairly considered all this contrary evidence in forming her conclusion. For these reasons, the undersigned finds that ALJ's analysis unsupported by substantial evidence and recommends that the matter be reversed and remanded to the Commissioner for further proceedings to reconsider Claimant's pulmonary impairments.

## III. RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** that the final decision of the Commissioner be **REVERSED** and that this matter be **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), to the Commissioner for reconsideration with instructions to conduct additional proceedings to remedy the herein identified defects in the original proceedings.

July 24, 2026

Colin H Lindsay, Magistrate Judge
United States District Court

cc: Counsel of record

**<u>Notice</u>**

Pursuant to 28 U.S.C. § 636(b)(1)(B)-(C), the undersigned Magistrate Judge hereby files with the Court the instant findings and recommendations. A copy shall forthwith be electronically transmitted or mailed to all parties. 28 U.S.C. § 636(b)(1)(C). Within fourteen (14) days after being served, a party may serve and file specific written objections to these findings and recommendations. Fed. R. Civ. P. 72(b)(2). Failure to file and serve objections to these findings and recommendations constitutes a waiver of a party's right to appeal. *Id.; United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981); *see also Thomas v. Arn,* 474 U.S. 140 (1985).